UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LOGANSPORT MACHINE CO., INC.,           )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      CAUSE NO. 3:12-CV-233 JD
                                        )
NEIDLEIN-SPANNZEUGE GmbH and            )
JAMES STROKER,                          )
                                        )
            Defendants.                 )

## Opinion and Order

Plaintiff Logansport Machine Co., Inc. (LMC) and Defendant Neidlein-Spannzeuge GmbH (Neidlein) attempted to sever its business relationship after Neidlein decided that it no longer wanted to retain LMC as its sole distributor and importer of Neidlein's face drivers in North America. After learning of Neidlein's intent to terminate the business relationship, LMC discovered that Defendant James Stroker (Stroker), LMC's former national sales manager responsible for the sale of Neidlein chucking tools in North America, started up his own business, Spin Tech Tools, and was expected to become the new exclusive distributor of Neidlein products in North America.

On April 30, 2012, the day before the cancellation of LMC's Distributorship Agreement with Neidlein was to become effective (and over six months after notice of its termination was provided by Neidlein to LMC), LMC filed a Verified Complaint in Cass County Circuit Court. LMC claims that Stroker breached his fiduciary duties and tortiously interfered with LMC's business relationships by stealing confidential, proprietary, and trade secret information from LMC in order to hit the ground running with the sale of Neidlein products through Spin Tech Tools. LMC also asserts that Neidlein breached its agreements with LMC and failed to perform

promises that LMC relied on to its detriment.  LMC sought and received an *ex parte* temporary

restraining order (TRO) under Indiana Trial Rule 65.  The TRO temporarily enjoined the

Defendants from the following:

1.   Changing the status quo regarding the distribution Agreement and/or
     terminating the same;
2.   Selling Neidlein products in the United States, Canada, and Mexico
     through any entity but LMC;
3.   Interfering with LMC's customers and vendors using LMC's confidential
     information; and
4.   Otherwise using or disclosing LMC's Confidential Information and trade
     secrets.

[DE 2-7].

On May 4, 2012, Defendants removed this case from Cass County Circuit Court and

established that this Court has diversity jurisdiction over the matter under 28 U.S.C. § 1332(a)(3)

[DE 2].  Defendants concurrently filed an Emergency Motion to Dissolve the TRO pursuant to

Federal Rule of Civil Procedure 65(b)(4) [DE 5, 6].  After holding an emergency status hearing

on the same day, the Court gave notice to the parties that the Court would proceed directly to a

preliminary injunction hearing because time was of the essence.[1]  Prior to the hearing, LMC filed

its memorandum arguing that the Court should extend the TRO or issue a preliminary injunction

[DE 10] and Defendants filed their memorandum opposing any request to extend the TRO or

issue a preliminary injunction [DE 17].

---

[1]*See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 441 (1974) ("[s]ituations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or against a preliminary injunction. In such circumstances, of course, the court can proceed with the hearing as if it were a hearing on an application for a preliminary injunction. At such hearing, as in any other hearing in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying preliminary injunctive relief, such as the likelihood of irreparable injury to it if an injunction is denied and its likelihood of success on the merits.").

On May 10, 2012, the Court held the evidentiary hearing during which the parties presented evidence and argument, and Defendants moved the Court to enter judgment rejecting the preliminary injunction request under Rule 52(c) of the Federal Rules of Civil Procedure. The Court took the matter under advisement.

As acknowledged by the parties in their submissions to the Court [DE 10 at 2; DE 17 at 10-11], absent an extension for good cause, the TRO has automatically dissolved by operation of law given the time limits set forth in the rules. *Granny Goose Foods,* 415 U.S. at 439-40 ("[a]n ex parte temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal."). The Court now states its findings of fact and conclusions of law as required under Rules 52 and 65 of the Federal Rules of Procedure to support its determination that no preliminary injunction is warranted in this case.[2]

## I.    Findings of Fact

### A.    The Parties

Plaintiff LMC is an Indiana corporation with its principal place of business in Indiana. LMC is a manufacturer and distributor of chucking tools. LMC distributes various manufacturers' chucks, which is a specialized type of clamp used to hold an object in place, typically a cylindrical object or rotating workpiece.

Defendant Neidlein is a German corporation with its principal place of business in

---

[2]For the same reasons that a preliminary injunction shall not issue at this time, as identified herein, the Court finds that no good cause for extending the TRO exists under Rule 65(b)(2).

Germany.  Neidlein produces face drivers that, when fitted into production machines, allow a machine operator to turn, grind, mill or hard-turn an entire outside diameter of a workpiece in one operation.  Face drivers are different than chucks and have different applications.  Neidlein's face drivers are used by various original equipment manufacturers ("OEMs") and their parts' suppliers, and are vital to the supply of machined parts to OEMs such as General Motors and Caterpillar.

Defendant Stroker is a citizen of Ohio and is the owner of Spin Tech Tools.

**B.     *The Parties' Business Relationships***

In 1993, LMC began distributing Neidlein's face drivers in North America.  Since then, LMC has distributed face drivers manufactured only by Neidlein and LMC does not manufacturer its own face drivers.  On December 8, 2007, LMC and Neidlein entered into a written distribution agreement (the "Distributorship Agreement"), which became effective January 1, 2008 [DE 1-1].  The Distributorship Agreement appointed LMC as the sole distributor and sole importer of Neidlein chucking tools in the United States and Canada, and as a distributor of Neidlein chucking tools in Mexico, but not on an exclusive basis. *Id*.  In relevant part, the Distributorship Agreement required LMC to buy Neidlein tools for its own account; abstain from competition resulting in a detriment to Neidlein; treat all technical and commercial information from Neidlein as confidential; and refrain from manufacturing face drivers during the life of the agreement and for two years after its termination. *Id*.  The Distributorship Agreement also indicated that it could be cancelled by the parties subject to six months notice, and that upon cancellation of the agreement the parties would "negotiate the terms for disposition of customer lists and all items related to the operation of Neidlein business" and

required Neidlein to "re-purchase from LMC its inventory of Neidlein products (which are usable and saleable within the last 12 months) at a purchase price equal to the price paid by LMC to Neidlein for such products less 20% restocking charge." *Id.*

Neidlein represents that in the early Fall of 2009, Neidlein made LMC aware that it was dissatisfied with LMC's performance under the Distributorship Agreement because Neidlein's share in the face driver market had declined. Neidlein did not terminate the Distributorship Agreement at the time because it believed that LMC would provide more consistency in the administration of Neidlein's account through a single account manager. However, by late Fall Neidlein was still dissatisfied. LMC's current President, Gordon "Jay" Duerr III, then notified Neidlein that it was hoping to hire Jim Stroker as "someone who is trained in sales and has a history to get moving right away and has product knowledge [relative to the application of face drivers]" [Defendants' Exhibit 2].

Stroker represents that in late 2009, an LMC representative approached Stroker with an offer to join LMC. At the time of LMC's offer, Stroker was employed as regional sales manager at Riten, a manufacturer of face drivers and a competitor of Neidlein. On or about February 1, 2010, LMC hired Stroker as its national sales manager responsible for the sale of Neidlein chucking tools in North America, and LMC reported to Neidlein that it was excited to have Stroker as an employee because he "has great product, industry and customer knowledge." [Defendants' Exhibit 3]. Stroker contends that after he started working for LMC, he discovered that sales of Neidlein's face drivers for the 2009 fiscal year were on pace for $450,000, which was far less than what was represented to him before he came to LMC. Dissatisfied with LMC, Stroker resigned from LMC on September 6, 2011.

On October 14, 2011, Neidlein sent LMC a letter cancelling the Distributorship Agreement effective April 30, 2012 [DE 1-2]. The letter indicated that Neidlein could not understand why Stroker was no longer with LMC, when it believed that Neidlein's high business volume during the recent months was due to Stroker's efforts. *Id.* In light of its notice of cancellation, Neidlein requested that LMC "make sure that the client details (addresses/contacts/sales figures/sales volumes) from the Neidlein business" were sent to Neidlein. *Id.*

Duerr testified that upon receipt of the cancellation notice, he and his father went to Germany to discuss the matter at Neidlein's office, but Neidlein refused to reconsider. At this point, the parties began to engage in negotiations for the termination of their business relationship. Documents show that on December 15, 2011, Neidlein communicated with LMC that it would not pay LMC the 600.000 EUR requested by LMC in exchange for its promise to refrain from distributing competitive products for five years[3] [DE 1-3]. Instead, Neidlein counter-offered to pay LMC 100.000 EUR for the customer lists and a two year anti-competition agreement. *Id.* Neidlein further offered to take back specified inventory at twenty percent less the purchase price, granted LMC a two month transition period during which goods already ordered could be delivered after April 30, 2012, and required customers to be notified about the distribution change two to three months prior to May 1, 2012. *Id.* Neidlein also informed LMC for the first time on December 15 that Neidlein would be distributing its products in the United States via Stroker and Spin Tech Tools. *Id.*

---

[3]At the time, nothing prevented LMC from competing against Neidlein by selling another manufacturer's face drivers.

After narrowing its terms [Defendants' Exhibit 18], Neidlein and LMC had their attorneys draft a Cancellation Agreement [DE 1-4]. The Cancellation Agreement reflected that "[b]oth parties are interested in terminating their business partnership to their mutual satisfaction, and that, while there was no obligation on the part of LMC to transfer any customer data under the Distributorship Agreement, LMC "agrees to release all customer information by May 3rd, 2012 . . .[data which comprised of] address[es], contact person[s], turnover and the sales data of all customers of the respective items sold." *Id*. In the Cancellation Agreement, LMC agreed to abstain from selling competitive products, that is "face drivers, exchangeable parts of face drivers, live centers, dead centers, spare parts, and single components," in North America for two years and promised to ensure a "smooth transition of business;" and, in return, Neidlein agreed to make a payment of 85.000 EUR on the first day of May for the next three years and agreed to take back existing inventory (as reflected on LMC's inventory lists) at specified prices. *Id*. Neidlein would also allow LMC two months to complete orders which were placed before May 1, 2012. *Id*. The Cancellation Agreement, once fulfilled, purported to discharge the parties from claims arising from the Distributorship Agreement. *Id*.

Four months after issuing the notice of termination, in February of 2012, Neidlein, with the knowledge of LMC, began notifying end users/customers of Neidlein face drivers that, effective as of May 1, 2012, they would no longer be able to order Neidlein face drivers from LMC. Neidlein also advised customers that they would only be able to order Neidlein face drivers and component parts from Spin Tech Tools. Per Duerr, this negatively impacted LMC's business and LMC complained to Neidlein.

In any event, LMC began complying with the Cancellation Agreement and provided

Neidlein with its inventory lists[4] [Defendants' Exhibit 19]. LMC claimed that it also turned over

detailed customer data, including contact information and sales histories; yet, Duerr admitted

that as of April 20, 2012, LMC had not released complete customer data, including customer

lists, names, contacts, and sales figures as requested in the initial notice of cancellation from

Neidlein [Defendants' Exhibits 9, 26]. Duerr admitted that turning over this information was a

prerequisite for Neidlein's making payments to LMC.

Neidlein argues that it was LMC's attorneys who refused to accept the terms agreed to by

Neidlein and then offered substantially different terms, although not related to the amount of

money to be paid for LMC's customer information. Neidlein produced a letter and

memorandum dated April 13, 2012 from Duerr, wherein LMC required various substantive

changes to occur to the Cancellation Agreement before LMC would "finalize and sign the

agreement." [Defendants' Exhibit 25]. Duerr confirmed at the evidentiary hearing that these

were the changes that LMC wanted made to the Cancellation Agreement, however, he believed

that once Neidlein rejected these changes, LMC ultimately accepted the Cancellation Agreement

as written. The correspondence between Neidlein and LMC in late April indicates otherwise. In

fact, it appears that any attempt to negotiate a final solution for the termination of the business

relationship was halted. [Defendants' Exhibits 26, 27].

### C.      *LMC's Customer Development and Business Tracking System*

LMC is a small family run operation and since opening its doors in 1916 the Duerr

---

[4]At the time of the evidentiary hearing, Duerr testified that LMC had approximately $200,000 in
Neidlein inventory and was unable to fill all of their purchase orders because LMC began
reducing Neidlein inventory in February 2012 (per Neidlein's request) and Neidlein stopped
shipping to LMC regularly.

family has invested time, energy, and financial resources in developing goodwill with its vendors and customers. In relevant part, when LMC began distributing Neidlein's face drivers in 1993, Duerr explained that no one else sold the product in North America. LMC was responsible for buying the product, determining price margins, marketing the product in English, and finding end users. Neidlein did not tell LMC who to sell the product to and did not necessarily know the identity of the end users (although Neidlein learned the identity of some customers through warranty claims or other business dealings with LMC).

In order to track its products and customer orders, Duerr represented that since 1996, every single product sold (including Neidlein products) and the purchaser of the product have been recorded in LMC's Enterprise Resource Program known as Made to Manage ("M2M"). Duerr explained that M2M contains the identification of up to 1,000 LMC customer names and has the capacity to run various reports disclosing the identity of LMC's customers, the identity of the contact persons and phone numbers for the customers, quotes (open and closed) and quote dates, price margins, part numbers, product classes, status notes, shipping terms, safety stock numbers, and essentially all of LMC's accumulated proprietary business sales information [Plaintiff's Exhibits P-1, P-2, P-3; DE 24, 25]. Mr. David Lee Rumple, Vice President of Sales at LMC, also testified that M2M contains all of LMC's information for every customer and every product sold since 1996.

LMC limited access to the M2M system by keeping it password protected and only allowing approximately fourteen office and clerical staff members access to the system; however, it did not normally implement confidentiality or non-compete agreements with its employees, nor did it effectuate a company policy that such information was to be kept

confidential. Further, the M2M information is available in paper format and maintained in unlocked filing cabinets during the day, thereby allowing all LMC employees to have access to the M2M information. LMC customers and Neidlein do not have access to M2M.

When LMC hired Stroker as its national sales manager for Neidlein products, LMC gave Stroker training and complete access to the M2M system. LMC identifies the information contained in M2M as the confidential information it believes Stroker downloaded and provided to Neidlein [Plaintiff's Exhibits P-1, P-2, P-3; DE 24, 25], and LMC admits that "[t]he dispositive issue in this case" concerns this confidential information [DE 10 at 5]. The only evidence that LMC has to support its allegation of misappropriation is an email dated September 6, 2011 (the date Stroker resigned), which revealed that Stroker attempted to email himself LMC's sales orders (copies of customer orders) for the week ending in September 2—information that is stored in the M2M system [Plaintiff's Exhibit P-7]. However, the email message that Stroker attempted to send to his personal email account was truncated due to its size, and Duerr never determined exactly what Stroker attempted to send to his personal email account on September 6. *Id*. Despite having access to Stroker's business computer since Stroker resigned, Duerr confirmed that the September email is the extent of the evidence that LMC has obtained which indicates that Stroker took LMC's confidential information from the M2M system. Rumple confirmed that he too, had no knowledge that Stroker ever downloaded and gave M2M information to Neidlein.

At the evidentiary hearing, Duerr clarified that the information contained in LMC's M2M system is the same confidential information that LMC offered to sell Neidlein for a particular price during their negotiations to terminate the business relationship. Duerr testified that LMC

suffered irreparable harm when Stroker stole and used the M2M information without payment to LMC because it gave Neidlein and Stroker a sixth month competitive advantage.

During the evidentiary hearing, Stroker testified that he only used M2M to look up LMC part numbers and he never had knowledge of how to download M2M materials and send the downloads to himself. Stroker explained that the September 6 email which he sent to his personal account represented information that an LMC employee sent to him for followup on sales. In fact, Stroker testified that he did followup on these sales for a couple of weeks after his resignation. Stroker maintains that he did not take and use business information from LMC for the benefit of Neidlein or Spin Tech Tools. He also argues that the market for face drivers is well known in the industry and he had personal knowledge of the industry prior to joining LMC. Stroker represented that the money derived from Spin Tech Tools is his sole source of income and he is currently deriving "zero" business on account of the TRO issued by the state court. Stroker reported that given his limited funds, the TRO has drastically impacted his livelihood.

## II.  **Conclusions of Law**[5]

To win a preliminary injunction, a party must show[6] that it has (1) no adequate remedy at

---

[5]Findings made at this stage do not bind the Court as the case progresses given that the Court did not consolidate the preliminary injunction hearing with a trial on the merits. *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011).

[6]The decision to grant LMC's injunction in state court would have been measured by similar factors: (1) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; 2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; 3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and 4) whether, by the grant of the preliminary injunction, the public interest would be disserved. *See Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.,* 820 N.E.2d 158, 163-64 (Ind. Ct. App. 2005).

law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. *Ezell v. City of Chi.,* 651 F.3d 684, 694 (7th Cir. 2011) (citation omitted). If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Id.*

In determining whether to grant injunctive relief, the district court must take into account all four of these factors and then exercise its discretion to arrive at a decision "based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986). This process involves engaging in what is called the "sliding scale" approach, meaning that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc*., 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting *Abbott Labs.*, 971 F.2d at 12).

A.      *Likelihood of Success on the Merits*

1.      **Trade Secret and Misappropriation Claim**

In support of its trade secret claim, LMC has provided confidential business records created from its M2M data management program that were allegedly misappropriated by Stroker

and used for the benefit of Neidlein and Spin Tech Tools [DE 24, 25].  Included in this data is

the information that Duerr and Rumple of LMC testified was available through the M2M system,

including lists of customers who have purchased Neidlein products from LMC while Stroker was

employed at LMC, along with their contact information, pricing and margin information, order

status information, and other product and sales history information.

Under the Indiana Uniform Trade Secrets Act, a trade secret is: (1) information; (2)

deriving independent economic value; (3) not generally known or readily ascertainable by proper

means by another who can obtain economic value from its disclosure or use; and (4) the subject

of efforts, reasonable, under the circumstances, to maintain its secrecy. *Amoco Prod. Co. v.

Laird*, 622 N.E.2d 912 (Ind. 1993); *see* Ind. Code § 24-2-3-2 (defining "trade secret" as

"information, including a formula, pattern, compilation, program, device, method, technique, or

process, that: (1) derives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable by proper means by, other persons who

can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

reasonable under the circumstances to maintain its secrecy.").

A party that asserts actual or threatened misappropriation of its trade secrets may seek an

injunction, and a complainant may recover damages for the actual loss caused by

misappropriation. *See* Ind. Code § 24-2-3-3 to 4.  Misappropriation includes the acquisition of a

trade secret by a person who knows or has reason to know that the trade secret was acquired by

improper means, and it includes the disclosure or use of a trade secret by a person who either

used improper means to acquire knowledge of the information, or had a duty to maintain the

secrecy of the information, or obtained the information from a person who had a duty to maintain

its secrecy. *See id.* § 24-2-3-2.  The party asserting misappropriation of a trade secret must identify the trade secrets and prove that they exist, prove the acquisition of the trade secret as a result of a confidential relationship, and show the unauthorized use of the secret. *See Eaton Corp. v. Appliance Valves Corp.*, 526 F.Supp. 1172, 1178 (N.D. Ind. 1981); *Amoco Prod.*, 622 N.E.2d at 920.

Relevant to this case is the fact that combinations of publicly known or readily ascertainable information may be a trade secret if the combination is unique and was not previously known in the market place. *Weston v. Buckley*, 677 N.E.2d 1089, 1092 (Ind. Ct. App. 1997) (citing *Amoco Prod.*, 622 N.E.2d at 920) ("[I]t is a well settled principle 'that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'").  Whether information is readily ascertainable depends upon the degree of time, effort and expense required to duplicate or acquire the information by proper means. *Id.*  Thus, the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known. *Amoco Prod.*, 622 N.E.2d at 920 (citation omitted).  Indiana courts have held that customer lists and pricing information are protectable trade secrets. *See Ackerman v. Kimball Intern., Inc.*, 634 N.E.2d 778, 783-84 (Ind. Ct. App. 1994), *aff'd*, 652 N.E.2d 507 (Ind. 1995) (finding that customer and supplier lists and pricing information are trade secrets); *Michels v. Dyna–Kote Indus., Inc.*, 497 N.E.2d 586, 588-89 (Ind. Ct. App. 1986) (customer lists may be interpreted as trade secrets).

Therefore, in order for LMC to succeed in showing a likelihood of success on the merits

of its misappropriation of trade secrets claim, it must show that the information had independent value, that the information is not readily ascertainable, that the information in combination was unique and not previously known in the market place, that LMC took reasonable steps to protect the information, and that Stroker acquired and used the trade secrets from LMC. For the reasons discussed below, the Court finds that it is unlikely that LMC could prove all of the above stated elements for its asserted trade secrets located in the M2M system.

The Court notes at the outset that LMC did not normally employ secrecy agreements, confidentiality agreements, or non-compete agreement with its employees, including Stroker. Although this fact is not dispositive on the element that LMC must have made efforts "reasonable under the circumstances" to keep its confidential information secret, it is a factor weighing against LMC on that element for its alleged M2M secrets.

LMC has shown that its M2M system was password protected and that LMC limited access to its electronically stored information to only a dozen or so employees. However, LMC also maintained paper files of the M2M information which were stored in unlocked file cabinets during the day, that were then locked after hours. Duerr confirmed that physical access to the company's M2M paper files and records were still restricted to Plaintiff's employees. Further, LMC did not give its competitors or customers access to M2M, and LMC verbally warned its employees that the M2M information was to be kept confidential.

Also weighing in favor of LMC's position that the M2M information constitutes protectable trade secret information, is the fact that the information is not readily obtainable in its current form and it possesses independent economic value. Although Defendants argue that the customer base for chucking tools is information known publically in the industry and that

Stroker had personal knowledge of end users/customers, no party disputes that LMC has

accumulated almost sixteen years worth of detailed customer information, including the

identification of the customers' direct contact person, pricing and shipping arrangements,

product and sales information, quotes, etc.  Notwithstanding the fact that some of the information

contained in the M2M database is generally known or available in the public domain, the

information compiled in the M2M system demonstrated a unique undertaking by LMC, who

engaged in a considerable outlay of resources of time, effort, and expense to consistently

maintain and update its customer database.  The unique compilation of the M2M information

generated by LMC over the course of many years would require considerable resources to

duplicate or acquire the information by proper means.   In addition, the fact that Neidlein was

willing to pay for the information and LMC was willing to put a price on the information

supports the finding that the accumulated customer information possessed independent economic

value.  Stroker indicated that the M2M system allowed him to quickly search for products and

product numbers which then gave him the information necessary to service any customer, and

Duerr confirmed that the information available in M2M would allow someone to immediately

startup a competing business.  These factors would suggest that the M2M information is entitled

to protection under Indiana law.

      Unfortunately for LMC, its evidence does not demonstrate that upon Stroker's departure,

he took with him or has used materials that likely satisfy this test.  While it is likely that LMC's

compilation of customer contacts, quotes, status of orders, and other materials accumulated since

1996 are likely protected as trade secrets, LMC has provided no evidence, other than a truncated

email from September 2011, which would support LMC's allegation that such materials were

improperly transferred from Stroker to Neidlein or Spin Tech Tools. In fact, Duerr had Stroker's computer since September 2011, and he knew since December 2011 that Stroker was named Neidlein's new exclusive distributor. Yet five months later, there is still no evidence that Stroker downloaded information from the M2M system and/or used that information for the benefit of Neidlein or Spin Tech Tools. In addition, the mere fact that Spin Tech Tools has received customer orders for Neidlein products does not show that Stroker took customer information from M2M, because customers were put on notice in early 2012 that future orders would be placed through Spin Tech Tools, and LMC admittedly gave Neidlein access to some customer information during their business dealings and as part of the termination process. LMC has not demonstrated that Stroker or Neidlein acquired M2M information by unlawful means or that they have subsequently used that information. Given the complete lack of evidence suggesting that Stroker or Neidlein acquired and used any of LMC's trade secrets, the Court cannot say that LMC is likely to prevail on this claim. Going forward, circumstances evidencing the Defendants inappropriate acquisition or use of LMC's trade secrets may be cause for future equitable action by this Court.

### 2. Common Law Claims

LMC alleges a host of common law claims under state law, including breach of contract, estoppel, tortious interference with business relationships, and breach of fiduciary duty. In particular, LMC claims that Neidlein breached its contract with LMC, presumably the Distributorship Agreement, by not repurchasing inventory and failing to negotiate terms for the disposition of the customer information. LMC also claims that Neidlein should be estopped from using LMC's M2M trade secrets without providing any compensation, because LMC relied

on Neidlein's promises to pay for the trade secrets, presumably under the Cancellation Agreement. LMC further alleges that Stroker breached his fiduciary duties to LMC by preparing to compete with LMC and using LMC's M2M information, and that he, along with Neidlein, tortiously interfered with LMC's clients and vendors using the information obtained from M2M.

As acknowledged by LMC, the crux of whether a preliminary injunction should issue in this case relates to whether or not LMC's M2M information is a protected trade secret and whether or not Stroker unlawfully acquired and used that information. Thus, there was little information, if any, presented to the Court which would enable the Court to effectively evaluate LMC's ability to succeed on its various common law claims. In any event, the Court discusses those claims briefly.

Neither party disputes the existence of the Distributorship Agreement. However, based on the record it does not appear the LMC could successfully prove that Neidlein breached that agreement. *See Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005) (noting that the essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages). Since Neidlein gave more than six months advance notice of its termination and engaged in extensive negotiations for the disposition of customer lists and related items, it does not appear that a breach occurred under these provisions. Although Neidlein was required to re-purchase from LMC its inventory of Neidlein products pursuant to a previously established valuation method, LMC admits that Neidlein and LMC had in fact resolved the amount that Neidlein was to pay for inventory which was specified in LMC's inventory lists. It is possible that Neidlein has defaulted in making the payments for the inventory, but again, insufficient evidence was presented for such a determination to be made.

18

In any event, this type of claim which could be satisfied by a monetary award would not support the Court's issuing an injunction, but the Court would encourage the parties to fulfill their respective obligations in this regard without delay.

To establish that the Cancellation Agreement was enforceable based on promissory estoppel, LMC would be required to prove that Neidlein made a promise which it should reasonably have expected to induce LMC to act, that the promise induced LMC to take action of a substantial character, and that injustice could only be avoided by enforcing the promise. *See Larabee v. Booth,* 463 N.E.2d 487, 490 (Ind. Ct. App. 1984). Here too, the information provided to the Court would suggest that the parties never reached a final consummation of the agreement by the end of April 2012. In addition, LMC admitted at the hearing that it did not provide Neidlein with the complete customer data, including customer lists, names, contacts, and sales figures, which was requested in the initial notice of cancellation from Neidlein—which was also a prerequisite for Neidlein's making payments to LMC. Given the limited information available at this time, the Court is unable to say that LMC has met its burden in proving its likely success on these contract claims.

Similarly, any claim for tortious interference with a business relationship requires some independent illegal action on the part of Defendants, *see Rice v. Hulsey,* 829 N.E.2d 87, 91 (Ind. Ct. App. 2005), and any claim for breach of Stroker's fiduciary duties under general agency principles would require LMC to establish that Stroker violated his duty of loyalty to LMC by using LMC's trade secrets to the detriment of LMC, *see SJS Refractory Co., LLC v. Empire Refractory Sales, Inc*., 952 N.E.2d 758, 768 (Ind. Ct. App. 2011) (reasoning that an employee may make arrangements to compete with his employer, but he cannot properly use confidential

information specific to his employer's business); *Northern Elec. Co., Inc. v. Torma,* 819 N.E.2d 417, 430 (Ind. Ct. App. 2004). LMC seems to assert that simply because Stroker "had access to LMC's confidential information, quit, [and] signed on with Neidlein," then one can presume wrongful conduct on the part of Defendants [DE 2-6 at 7]. But given the above discussion relative to the lack of evidence showing that Stroker acquired and/or used any of LMC's confidential M2M information, and the fact that LMC did not provide any evidence during the preliminary injunction hearing which tended to show that Defendants engaged in other illegal actions relative to this information, the Court finds LMC's likelihood of success on these claims to be minimal at this time.

Although there is some likelihood that LMC would succeed in showing that it had a trade secret in its M2M information, the evidence LMC presents establishing its likelihood of succeeding on the claims alleged in its Verified Complaint is weak. The Court will weigh this finding with the other factors for determining whether to issue an injunction.

### B.      *Adequate Remedy at Law and Irreparable Harm*

In order to obtain an injunction, the plaintiff must show the threat of irreparable harm without adequate remedy at law. *See Ezell,* 651 F.3d at 694. The Court is not persuaded that the evidence weighs in favor of a finding that there is no adequate remedy at law, or that LMC will suffer irreparable harm without the issuance of an injunction.

First and most importantly, LMC relies too heavily on the argument that Stroker had access to the M2M information, that Stroker admittedly sent one week worth of sales information to himself on the day that he quit, and that he then went to work for Neidlein, and therefore, the acquisition and use of LMC's trade secrets is inevitable.

After LMC discovered in October 2011 that it would no longer be Neidlein's distributor and discovered in December 2011 that Stroker would become Neidlein's new distributor, LMC waited over four months to file this lawsuit and seek a restraining order. Further, since Stroker quit LMC in September 2011, LMC has had control over Stroker's work computer, and has yet to produce any evidence that Stroker took or used LMC's M2M information, other than a single truncated email purportedly consisting of one week's worth of sales which was discovered by LMC on September 7, 2011. LMC's delay in seeking an injunction weighs against finding irreparable harm when it knew in December 2011 that Stroker was going to work for a competitor and could have sought such an injunction at that time.

Also important to the Court's determination that LMC does not face irreparable harm absent the issuance of an injunction, is Duerr's representation that the alleged irreparable harm suffered by LMC was that Neidlein and Stroker had a sixth month competitive advantage by using LMC's M2M information. However, the harm identified by Duerr constitutes past harm, which is insufficient to support injunctive relief. *See e.g. Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010) (standing to request injunctive relief is lacking when only past harm is alleged).

To the extent that LMC argues that it delayed in filing this lawsuit and seeking injunctive relief because it relied in good faith on Neidlein's promises to pay LMC for its confidential M2M information, this argument supports the finding that an adequate remedy at law exists. Consistent with Duerr's testimony that LMC placed a price on its customer information and offered to sell it to Neidlein, LMC has essentially conceded that a particular value can be placed on its confidential information (even if it were later secured by unlawful means). And the argument made by LMC that the M2M information, once allegedly stolen, could not have a

monetary value placed on it, is without merit. In fact, it appears that LMC is still willing to accept payment for this information. Further, LMC made no efforts to secure its M2M customer information with standard confidentiality agreements and/or non-compete agreements with its employees, including Stroker. LMC did limit M2M's access to its employees, but having not taken active steps to limit its employees' use of that information belies any claim that the trade secrets have immeasurable worth.

And while it is true that loss of goodwill can constitute irreparable harm for which no adequate remedy exists, *see Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), LMC has not shown a loss of goodwill on the part of Stroker's acquisition and use of its confidential information. Rather, the evidence produced shows that customers were notified in early 2012 that the business relationship between LMC and Neidlein was over (at the end of April 2012) and they were told that future orders for Neidlein's products would be placed through Spin Tech Tools. Any proof regarding loss of goodwill is vague and speculative and does not lend much support to LMC's request for injunctive relief.

Given the above discussion, LMC has failed to show that there is not an adequate remedy at law by way of monetary damages which would make LMC whole if it prevails on the merits. *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011) (an injunction requires a showing that monetary damages are inadequate to remedy the injury). LMC has also failed to show that it will suffer irreparable harm if a preliminary injunction is denied. *See Ezell,* 651 F.3d at 694.

### C.  *Balance of Harms*

In considering a request for a preliminary injunction, the district court must choose the

course of action that will minimize the cost of being mistaken. *See Am. Hosp. Supply v. Hosp. Prod., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1985). The Court now weighs the factors against one another and assesses whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Ezell,* 651 F.3d at 694. In considering the impact of the relief sought by LMC, the Court considers the potential effects to the Defendants and to nonparty individuals, including the interests of nonparty customers and their rights to conduct business freely.

LMC has not shown that its confidential information is imperiled by a departed employee. Instead, LMC has only speculated that Stroker took M2M information with him when he quit, and that he then provided that information to Neidlein. Further, LMC is a manufacturer and distributor of various chucking tools, and it has not shown an inability to continue running a successful business without the ability to sell Neidlein's face drivers. And assuming the non-compete provision in the Cancellation Agreement is not in effect, LMC could even become a distributor for any other face driver manufacturer. Indeed, any illusory harm to LMC at this stage will not outweigh the actual harm likely to be suffered by Stroker and the public.

Stroker has shown that if the Court were to grant the injunction the harm to him would be substantial. The evidence established that the money derived from Spin Tech Tools is Stroker's sole source of income and he was deriving no business on account of the TRO issued by the state court. Thus, should the injunction continue, it will have a drastic impact on Stroker's livelihood given his limited funds.

The public interest here also favors the non-issuance of an injunction. LMC has not only

23

failed to demonstrate that the harms it alleges are supported by the evidence, but LMC has confirmed that it no longer has sufficient inventory to fill all customer orders on account of LMC and Neidlein's mutual attempt to dissolve its business relationship since October 2011. Requiring Neidlein to revert back to using LMC as its distributor, after notifying customers in February 2012 that Stroker would be the new Neidlein distributor, would cause substantial disruptions and delays for end users/customers of Neidlein products, including various OEMs.

Accordingly, the Court finds that the balance of harm favors the denial of an injunction. LMC has a legitimate interest in preventing the disclosure of its M2M customer trade secret information, but whether the information was ever taken is speculative at best. Furthermore, Stroker has a legitimate right to pursue employment in his area of expertise and training. *See Eaton Corp.*, 526 F.Supp. at 1180 (noting that an employee, upon leaving his employment, may take with him and utilize the skill and general knowledge obtained by him during his employment). The evidence also shows that the customer base for chucking tools is limited and that LMC does not maintain an exclusive customer base. Where, as in this case, an injunction would likely destroy Stroker financially, but only cause LMC to suffer some competitive loss without resulting in devastation of its business, injunction is not the appropriate remedy. *See Ram Prods. Co., Inc. v. Chauncey*, 967 F.Supp. 1071, 1089 (N.D. Ind. 1997).

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Goodman v. Ill. Dept. of Fin. and Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005) (citation omitted). For the reasons set forth above, the Court concludes that LMC is not entitled to a preliminary injunction. Accordingly, LMC's Motion for Injunctive Relief [DE 2-5] is DENIED and

Defendants' Motion to Dissolve the Temporary Restraining Order is DENIED AS MOOT [DE

5].  No temporary restraining order or injunction is effective at this time in this case.

     SO ORDERED.

     ENTERED:   __May 22, 2012__


                  _____/s/ JON E. DEGUILIO_____
                  Judge
                  United States District Court